WALLACE, Judge.
 

 Leo Berube appeals his judgment and life sentence for first-degree murder. He argues that the trial court erred when it allowed the State to present improper
 
 Williams
 

 [1]
 
 rule testimony at his trial. Mr. Berube also argues that the trial court erred in denying his motion for judgment of acquittal because the State failed to present sufficient evidence of premeditation. We find no merit in Mr. Berube’s claim that the trial court erred in denying his motion for judgment of acquittal. However, because the admission of the
 
 Williams
 
 rule testimony at Mr. Berube’s trial constituted harmful error, we reverse his judgment and sentence and remand for a new trial.
 

 I. THE FACTS
 

 Mr. Berube was charged with the murder by strangulation of a forty-two-year-old prostitute. The murder victim and her husband had become addicted to crack cocaine. As a result of their drug addiction, the couple had lost their jobs, their home, and most of their possessions. At the time of the murder, the couple had been living day-to-day in a motel located on U.S. Highway 19 in Pinellas Park for about two months. The couple’s only source of income was the victim’s earnings from prostitution.
 

 On January 4, 2003, at approximately 3 a.m., someone strangled the victim with a cord from a lamp that hung near the bed in the couple’s motel room. Prior to this incident, the victim and her husband had been on a crack cocaine binge since New Years’ Day. About one hour before the victim was killed, the couple had exhausted both their funds and their supply of crack cocaine. The victim left the motel room to look for a customer. She encountered Mr. Berube, who had recently left a local bar. The victim solicited Mr. Berube, he accepted, and they returned to the motel room where the husband had remained.
 

 According to the husband’s testimony, he customarily concealed himself in the bathroom while his wife entertained her customers. On the occasion that his wife was killed, he hid in the bathroom when he heard the door to the motel room begin to open. Inside the bathroom, the husband amused himself by smoking the cocaine residue from some drug paraphernalia while his wife was with her customer. The husband waited the usual period of time for his wife to complete her business. After some time passed, the husband heard a loud bump or a bang. He waited a few minutes and then shook the bathroom sink, which was a signal to his wife. However, the wife did not respond. A few seconds later the bathroom door handle jiggled. Then the lock “popped open” and the door — which opened into the bathroom— started to open.
 

 
 *737
 
 The husband braced his foot against the door and swiped with a knife at a man standing on the other side of the door. The man retreated and told the husband, through the closed door, that he had given the victim something and that she was sleeping. The husband responded, “[J]ust get out of here and ... leave us alone.” The husband then started to leave the bathroom, but the man on the other side of the door warned him that if he came out he would kill him. After a few minutes, upon hearing the front door of the motel room open and close, the husband left the bathroom and found his wife’s naked body sprawled face up on the bed. She had been strangled to death with a lamp cord. The husband did not get a good look at the man on the other side of the bathroom door, and he did not identify Mr. Berube as that person.
 

 The guests in the adjoining motel room also heard the single, loud bang on the wall. The impact that caused the noise had sufficient force to shake or dislodge a mirror on the wall in the adjoining tenants’ room. There were three persons in that room, a teenage boy, his mother, and her husband. Despite the lateness of the hour, the boy was awake, playing a video game. He heard the bang, saw the mirror fall,
 
 [2]
 
 and heard a female voice whine and cry, “Help[!]” He opened the door to his motel room and saw a man leaving the victim’s room in a hurry. As the man hurried away, he looked at the boy. The boy noted that the man had a goatee and that his shirt was ripped and had blood on it.
 
 [3]
 
 The boy closed the door and went back to bed. The adults in the room both testified that they were awakened by the noise. One of them observed that the victim and her husband were arguing again. Such arguments were a relatively common event, and the couple went back to sleep.
 

 Pinellas Park police initially charged the husband with his wife’s murder. Several months later, law enforcement officers received the results of the DNA analyses of a blood smear on the wall above the bed in the motel room, blood found on the bathroom door frame, blood found on a wall lamp (the cord of which was used to strangle the victim), and a sample scraped from the victim’s fingernails. None of these four critical DNA samples matched the husband. However, Mr. Berube’s DNA was an exact match for the blood found on the wall above the bed, on the bathroom door frame, and on the wall lamp. In addition, although the DNA from the scrapings of the victim’s fingernails was not an exact match to Mr. Berube’s DNA profile, he could not be excluded as a contributor. The presence of the blood in the motel room was consistent with the laceration or scratch that Mr. Berube sustained to the top of his right hand that night.
 
 [4]
 

 Mr. Berube was also linked to the motel room by a pair of eyeglasses found on the bed near the victim’s body. An optician’s
 
 *738
 
 records confirmed that the eyeglasses had been fabricated for Mr. Berube. Later, during questioning by the police, Mr. Be-rube would admit his ownership of the eyeglasses. As a result of these developments, the murder charge against the husband was dropped and the police turned the focus of their investigation to Mr. Be-rube.
 

 Mr. Berube did not take the stand on his own behalf at trial. Therefore, our record concerning his version of the events in question is limited to the statements that he made to police detectives in a videotaped interrogation. A slightly redacted version of the videotape was played for the jury at trial.
 

 During police questioning, Mr. Berube initially vehemently denied ever going to the motel or meeting the victim on the night in question. Instead, he offered a tale about having been attacked by muggers that evening as he was walking down the street near the motel, returning home from a local bar.
 
 [5]
 
 After the detectives revealed to Mr. Berube that his blood and eyeglasses had been found in the room, he changed his story. However, confronted with evidence placing him in the room, his explanations of the events of the evening in question varied widely, never coalescing into a single, coherent narrative.
 

 Mr. Berube finally admitted entering the motel room with the victim for a consensual, paid sexual encounter, but he disputed the husband’s version of events. Mr. Berube’s initial story was that he entered the room with the victim, received oral sex, paid the victim $40, and then left. He denied that any altercation or argument had occurred and denied the detective’s suggestion that perhaps the victim had tried to rob him. He continued to insist that he was injured while being mugged after leaving the victim’s room. Later, he altered his story, saying that while he was with the victim, a man came out of the bathroom demanding, “What are you doing with my old lady?” In response to this, Mr. Berube claimed that he simply fled. Still later, Mr. Berube claimed that he responded to a noise coming from the bathroom by demanding to know who was there. He then tied the lamp cord around the victim’s wrists “to control her” while he investigated the noise in the bathroom.
 
 [6]
 
 In one version of events, the husband came out, brandishing a knife in his left hand. Again, Mr. Berube claimed that he fled. In a later version, Mr. Berube claimed that the victim yelled to her husband that Mr. Berube had given her $40 but that he had more and that the husband should get it from him. Although initially denying any physical altercation with the husband, Mr. Berube then stated that the husband came at him with a knife. Mr. Berube responded by kicking the husband in the chest or stomach, and the husband retreated to the bathroom. With regard to his broken leg, Mr. Berube finally admitted that he had not been mugged at all and had broken his leg when he tripped while running from the scene.
 

 Throughout the interview, Mr. Berube insisted that he did not remember being cut or scratched, despite incontrovertible evidence that his blood had been found at
 
 *739
 
 various locations in the motel room. Mr. Berube also insisted that the victim was alive, awake, yelling, and fully clothed when he left the motel room.
 
 [7]
 

 II. THE WILLIAMS RULE ISSUE
 

 A. The Williams Rule Witnesses and Their Testimony
 

 The State’s notice of intent to use similar crime evidence indicated it intended to introduce evidence of three prior incidents. The first incident involved Mr. Berube’s former girlfriend, C.C., with whom Mr. Berube had a child. C.C. claimed that Mr. Berube raped her in 1993, five months after they had separated. According to C.C., Mr. Berube tied her arms and legs and stuffed a rag in her mouth while raping her. C.C. reported the incident to the police, but Mr. Berube was never charged with a crime.
 

 The second incident the State sought to introduce into evidence involved the murder of C.D. C.D. had been strangled in her home in August 1994. Mr. Berube was a suspect in that murder. During the investigation, he admitted to police that he had met C.D. at a local bar (the same bar he had come from the night of the victim’s murder) and accompanied her home. Mr. Berube admitted that he had engaged in consensual sexual relations with C.D. involving both vaginal and anal intercourse. He told police officers investigating the crime that when he heard a noise in the house, he grabbed his things and fled. Mr. Berube also claimed that C.D. was still alive when he left her home. No charges were ever filed in that case.
 

 The third incident the State sought to admit into evidence concerned the rape of B.R. in December 1994. Prior to the incident in question, Mr. Berube and B.R. had been acquainted with each other. B.R. conceded that she and Mr. Berube had had consensual sexual intercourse at least once before the rape. During the attack, Mr. Berube suffocated B.R. to unconsciousness by covering her mouth and nose with his hands and then raped her anally. When B.R. regained consciousness, she began to struggle and tried to scream. Mr. Berube suffocated B.R. again by forcing her head into a pillow; then he raped her vaginally while she was unconscious. Mr. Berube was sentenced to twelve years in prison for this offense, and he was released in June 2002, about six months before the murder of the victim in this case.
 

 The State’s notice of intent to use evidence of prior crimes stated that evidence of the three incidents would be relevant to show “a continuing plan, scheme or design; to meet the Defendant’s anticipated defense of accident, lack of intent, lack of motive and justifiable use of force; and to demonstrate a plan or pattern followed by the Defendant in committing this type of offense.” The defense filed a motion in limine to exclude the use of the
 
 Williams
 
 rule evidence. After a hearing at which both C.C. and B.R. testified, the trial court denied the defense motion in limine as to the incidents involving C.C. and B.R. but excluded the evidence concerning the unsolved murder of C.D.
 

 The trial court ruled that the facts in the incidents involving C.C. and B.R. were “substantially similar and admissible to show a pattern or plan followed by the Defendant in committing this type of offense and to meet the Defendant’s anticipated defense of accident, lack of intent, motive[,] and justifiable use of force.” The trial court noted that C.C. and B.R. were restrained while being raped and that Mr.
 
 *740
 
 Berube had a preference for anal sex. The trial court found that the act of choking B.R. and the fact that Mr. Berube “stuffed a rag down [C.C.’s] throat” was evidence of motive and pattern of conduct, and was relevant to meet Mr. Berube’s anticipated defense of accident, lack of intent, lack of motive, and justifiable use of force. In excluding the evidence regarding the murder of C.D., the trial court stated, “It appears that the greatest effect of this evidence would be to establish the bad character or criminal propensity of Defendant. Even if the lower general standard in § 90.402[,] Fla. Stat.[,] were applied, the prior crime would still not be relevant.”
 

 B. Analysis of the Williams Rule Issue
 

 Section 90.404(2)(a), Florida Statutes (2002), which codifies
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959), provides that a party may introduce similar crime evidence when it is “relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.” In addition, the trial court should also exclude otherwise relevant evidence if the probative value of that evidence is outweighed by the danger of unfair prejudice.
 
 See
 
 § 90.403;
 
 Audano v. State,
 
 641 So.2d 1356, 1359 (Fla. 2d DCA 1994) (“In determining the admissibility of collateral crime evidence, the trial court must make two determinations: (1) whether the evidence is relevant or material to some aspect of the offense being tried, and (2) whether the probative value is substantially outweighed by any prejudice.”).
 

 The State’s notice of intent to use collateral crime evidence simply repeated the general language of the statute and was not tailored to the facts of this case. During the
 
 Williams
 
 rule hearing, the prosecutor argued that he filed the notice of intent to use prior similar act evidence because Mr. Berube had “set forth a defense that in this case as well [as] in three other cases, he intended certain conduct and that the victim ... was alive when he left. Identity is not the issue.” The prosecutor later added that it sought to enter the evidence, in part, to rebut Mr. Be-rube’s anticipated defense. The prosecutor explained the State’s position as follows:
 

 The issue is under the
 
 Williams[
 
 ] Rule case are we suggesting similar acts about people who are asphyxiated in some fashion involving sexual conduct when Mr. Berube says I had this conduct with them, but they’re alive when I leave them. He said it to everybody, every time, and he has been successful, except when he changed his plea in the [B.R.] case.
 

 His initial statement was I had this sex with her, but it was consensual. Just because [B.R.] revived, didn’t die, is no fault of Mr. Berube.
 

 Finally, the State argued that the evidence was relevant to rebut Mr. Berube’s defense “that the victims were alive when he left and also the general way in which the victims were killed.”
 

 Florida courts have set a high standard of admissibility for similar fact evidence whether the fact at issue is identity or mistake or accident.
 
 See State v. Savino,
 
 567 So.2d 892, 894 (Fla.1990) (“When the purported relevancy of past crimes is to identify the perpetrator of the crime being tried, we have required a close similarity of facts, a unique or ‘fingerprint’ type of information, for the evidence to be relevant.”). Additionally, “substantial similarity of crimes is a requirement when the [collateral crime] evidence is sought to be
 
 *741
 
 admitted for the specific purpose of establishing absence of mistake or accident.”
 
 Robertson v. State,
 
 829 So.2d 901, 909 (Fla.2002).
 

 The lack of specificity in the State’s notice of intent as well as the prosecutor’s comments reveal the State’s inability to articulate a clear and persuasive theory for presenting the desired
 
 Williams
 
 rule evidence. The most blatant flaw in the State’s logic is its argument that the testimony of the victims was necessary to rebut Mr. Berube’s anticipated defense “that the victims were alive when he left and also the general way in which the victims were killed.” Although the evidence concerning the murder of C.D. might have been relevant in this regard, the trial court excluded that evidence.
 
 [8]
 
 However, with regard to the rapes of C.C. and B.R., this argument makes no sense. Simply put, the two rape victims were not killed. Second, the State’s claim that “identity is not the issue” is flatly wrong. A defense theory that the defendant was not there when the victim was murdered is a straightforward identity defense. Indeed, that was Mr. Berube’s main defense — -that he was not there at the time the victim was murdered.
 

 The factual differences between the instant case and the two prior rape cases are many. Although B.R. was asphyxiated by covering her mouth, she was not strangled. C.C. was neither strangled nor asphyxiated in any fashion, despite the State’s repeated insinuations that she was. Although both women had been restrained — C.C. by the tying of her hands and legs, and B.R. by suffocation to the point of unconsciousness — neither of these victims had anything tied around her neck. Most important, of course, neither rape victim was murdered. As a result, we conclude that there was insufficient similarity between the facts in this case and the facts in the two prior rape cases to meet the relevancy test described in
 
 Savi-no.
 

 The State further argues that the testimony of C.C. and B.R. was relevant because it tended to “rebut any contention that the victim died by accident as he engaged in the practice of erotic asphyxiation, since the evidence showed he used choking and other means of restraining his victims in order to control them and not for the purpose of heightened sexual gratification.” The State’s argument in this regard is vaguely supported by the facts: During his interrogation, Mr. Berube stated that the victim was screaming and that he grabbed her and threw her on the bed, tied her wrists, and told her to stay put, all in an effort to control her. He purportedly bound C.C. for the same reason and stuffed a rag in her mouth to keep her quiet (although there was no evidence that he choked her or restricted her breathing).
 
 *742
 
 He did not bind B.R.; instead, he twice suffocated her to the point of unconsciousness, ostensibly to keep her under control and quiet. Although Mr. Berube did allude to a possible scenario involving erotic asphyxiation, this occurred only in his motion for judgment of acquittal, when his defense counsel argued that the State had provided sufficient evidence of, at best, a charge of second-degree murder. In any case, this was not Mr. Berube’s primary theory of innocence.
 

 With regard to the State’s argument that Mr. Berube’s treatment of C.C. and B.R. demonstrated a pattern or need to control or restrain his victims, we observe that the use of some means to confine and silence the victim is a feature of most rape cases. However, there was nothing distinguishing about the methods used to “control” the victims in the prior rape cases which could meet the requirement of “substantial similarity of crimes” necessary to establish absence of mistake or accident.
 
 See Robertson,
 
 829 So.2d at 909.
 

 Based on the above, we conclude that the testimony of the two rape victims did not bear any similarity or logical relationship to any material aspect of the crime for which Mr. Berube was being tried. As a result, the testimony of the two rape victims did nothing more than expose Mr. Berube’s bad character and his propensity to perpetrate sexual assaults against women with whom he had had a prior relationship.
 

 C. Harmless Error Analysis
 

 Having concluded that the admission of the
 
 Williams
 
 rule testimony was error, our next task is to decide if the error was harmless. § 59.041, Fla. Stat. (2008).
 

 The harmless error test, as set forth in
 
 Chapman [v. California,
 
 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.
 

 State v. DiGuilio,
 
 491 So.2d 1129, 1138 (Fla.1986).
 

 The State’s proof of Mr. Berube’s identity as the killer included his presence at the scene, his inconsistent statements to the investigating officers, and the DNA evidence. But the State’s proof did not exclude the possibility that the victim’s husband or an unknown third person had actually strangled the victim. In fact, the State had initially charged the victim’s husband with the murder.
 

 In considering the harmless error issue, we note that C.C. and B.R. were the State’s final witnesses at trial. Their testimony about the brutal attacks that they had endured at the hands of Mr. Berube was heart-rending. This testimony undoubtedly had a substantial impact on the jury. Furthermore, the prosecutor placed additional emphasis on the testimony of the two rape victims when he told the jury that the asserted similarities between the rape of B.R. and Mr. Berube’s encounter with the victim in this case proved that Mr. Berube was the killer. In light of the nature of the testimony from C.C. and B.R. and the State’s use of that testimony in closing argument, we are unable to conclude beyond a reasonable doubt that the admission of the testimony did not contribute to the verdict.
 

 III. THE PREMEDITATION ISSUE
 

 A. The Motion for Judgment of Acquittal
 

 In his motion for a judgment of acquittal, Mr. Berube asserted that the evidence
 
 *743
 
 was sufficient — at best — to support a verdict of second-degree murder. In support of this claim, Mr. Berube argued that the State had failed to present evidence that the victim’s murder was premeditated. According to Mr. Berube, the evidence suggested that the victim had died accidentally as a result of erotic asphyxiation rather than from a conscious purpose to cause her death. The trial court denied the motion for judgment of acquittal, and the jury found Mr. Berube guilty of murder in the first degree as charged.
 

 B. The Standard of Review
 

 Sufficiency of the evidence to withstand a motion for judgment of acquittal is reviewed de novo.
 
 Pagan v. State,
 
 880 So.2d 792, 803 (Fla.2002). When considering a motion for judgment of acquittal, the question is whether, “after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt.”
 
 Fitzpatrick v. State,
 
 900 So.2d 495, 507 (Fla.2005). In addition, the trial court’s finding on the issue of whether there is a prima facie case will be reversed on appeal only where the decision is unsupported by competent, substantial evidence.
 
 Orme v. State,
 
 677 So.2d 258, 262 (Fla.1996).
 

 C. Discussion of the Premeditation Issue
 

 On appeal, Mr. Berube contends that the trial court erred in failing to grant his motion for judgment of acquittal. Mr. Berube contends that the evidence was insufficient to establish the element of premeditation. We disagree. However, before addressing his argument, we review the basic principles pertaining to premeditated murder:
 

 Premeditation is the essential element which distinguishes first-degree murder from second-degree murder.
 
 Wilson v. State,
 
 493 So.2d 1019 (Fla.1986). Premeditation is defined as
 

 more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
 

 Id.
 
 at 1021. While premeditation may be proven by circumstantial evidence, the evidence relied upon by the State must be inconsistent with every other reasonable inference.
 
 Hoefert v. State,
 
 617 So.2d 1046 (Fla.1993). Where the State’s proof fails to exclude a reasonable hypothesis that the homicide occurred other than by premeditated design, a verdict of first-degree murder cannot be sustained.
 
 Hall v. State,
 
 403 So.2d 1319 (Fla.1981).
 

 Coolen v. State,
 
 696 So.2d 738, 741 (Fla.1997).
 

 In the trial court, Mr. Berube argued that the State failed to prove premeditation because the evidence showed that the victim could have died accidentally as a result of erotic asphyxiation. The trial court properly rejected this argument. There was no evidence before the trial court that either Mr. Berube or the victim had ever engaged in that practice.
 
 Cf. Randall v. State,
 
 760 So.2d 892, 901-02 (Fla.2000) (concluding that the evidence presented, which included testimony concerning the defendant’s history of choking women to heighten sexual arousal, did not support a verdict finding the defendant guilty of the premeditated murder of two women who died as a result of asphyxia by manual strangulation). More important, we conclude that the evidence in this ligature strangulation case was sufficient to
 
 *744
 
 support a jury finding that the victim’s killing was premeditated.
 

 Some jurisdictions hold that the length of time necessary to produce death by strangulation is sufficient by itself to support a jury finding of premeditation in a prosecution for murder in the first degree.
 
 See Perez-Ortiz v. State,
 
 954 So.2d 1256, 1259 (Fla. 5th DCA 2007) (collecting cases);
 
 Dupree v. State,
 
 615 So.2d 713, 718 n. 1 (Fla. 1st DCA 1993). This view does not prevail in Florida. On the contrary, the Florida courts deem evidence of killing by strangulation alone to be insufficient to support a jury finding of premeditation.
 
 See Bigham v. State,
 
 995 So.2d 207, 212-13 (Fla.2008);
 
 Randall,
 
 760 So.2d at 901-02;
 
 Green v. State,
 
 715 So.2d 940, 941, 943-44 (Fla.1998);
 
 Hoefert v. State,
 
 617 So.2d 1046, 1048-49 (Fla.1993);
 
 Perez-Ortiz,
 
 954 So.2d at 1259. However, evidence of strangulation, in conjunction with one or more additional facts indicating that the killer had time to reflect upon his actions and to form a conscious purpose to kill, justifies submitting the question of premeditation to the jury for its determination.
 
 See Dupree,
 
 615 So.2d at 718 n. 1. In this case, we find two such additional facts.
 

 First, the medical examiner testified that with a constant, even pressure and no movement by the victim, it takes at least two to three minutes to kill a person by strangulation. The evidence at trial showed that there were at least five distinct ligature marks on the victim’s neck. This fact is consistent with movement of the lamp cord during a struggle, i.e., each time the victim moved, her assailant lost his grip and had to reposition the cord. Consequently, the time necessary to cause the victim’s death was extended each time the cord was released and reapplied, giving the killer additional time to reflect on his actions and their probable effect on the victim. We conclude that the repetitive nature of the killer’s actions in repositioning the cord multiple times to begin the strangulation process anew is a factor from which the jury might properly infer premeditation. In several cases, Florida courts have held that sequential or successive acts by the killer directed toward achieving the asphyxiation of the victim are probative of premeditation.
 
 See Johnston v. State,
 
 863 So.2d 271, 285-86 (Fla.2003) (finding evidence sufficient for the jury to find premeditation where “the strangulation in this case was not a constant, continuous compression, but was ‘more of a manual throttling ... meaning it was more pressure, release, pressure, release’ ” (omission in original));
 
 Blackwood v. State, 777
 
 So.2d 399, 406-07 (Fla.2000) (finding evidence sufficient to support jury finding of premeditation where defendant had suffocated the victim by both manual and ligature - strangulation, placing soap and a washcloth in the victim’s mouth, and putting a pillow over the victim’s face);
 
 DeAngelo v. State,
 
 616 So.2d 440, 441-42 (Fla.1993) (concluding that the evidence supported the jury verdict of first-degree premeditated murder where the defendant had not only strangled the victim manually but also choked her with a ligature);
 
 Perez-Ortiz,
 
 954 So.2d at 1259-60 (holding that the issue of premeditation was properly submitted to the jury where the defendant first strangled the victim and then drowned her in a tub of water).
 

 Second, the State presented substantial evidence of an intense struggle between the victim and her assailant. The medical examiner noted contusions on the side of the victim’s neck, her left elbow, and her thigh. Mr. Berube’s blood — most likely from his lacerated right hand — was found on the wall over the victim’s head, very near the wall lamp, the cord of which was
 
 *745
 
 used to strangle the victim. Taken as a whole, the evidence was consistent with a scenario in which Mr. Berube was positioned over the victim’s head and brushed or bumped against the wall during a struggle. The DNA from the victim’s fingernails, for which Mr. Berube could not be excluded as a contributor, would support an inference that the victim fought to pull her assailant’s arms or hands away from her neck. At some point, the victim cried for help, but her plea went unheeded. We conclude that the evidence of a struggle occurring shortly before or during the killer’s time-consuming process of suffocating the victim is an additional fact supporting the jury’s finding of premeditation. Proof of a struggle between the killer and the decedent in a case of murder by strangulation constitutes evidence which will support a jury finding of premeditation.
 
 See Johnston,
 
 863 So.2d at 285-86 (finding proof sufficient for a jury to conclude that murder was premeditated where the evidence showed that the decedent struggled with her assailant and attempted to pull his hands from her face);
 
 Conde v. State,
 
 860 So.2d 930, 943 (Fla.2003) (holding that the jury could properly conclude that the defendant’s murder by strangulation of the decedent was premeditated where the evidence showed that the defendant spent considerable time with the decedent before attacking her and that she struggled during the attack);
 
 Blackwood,
 
 777 So.2d at 403-07 (finding that evidence of a struggle, together with other facts, was sufficient to support a jury finding of premeditated murder of a victim who was strangled to death);
 
 Holton v. State,
 
 573 So.2d 284, 289 (Fla.1990) (finding proof sufficient to establish premeditation where the victim of a strangling had long fingernails and the defendant had fresh scratch marks on his chest the day after the murder, suggesting a struggle);
 
 Dupree,
 
 615 So.2d at 717-19 (finding that evidence was sufficient for the jury to infer premeditation where the victim had been beaten prior to being strangled and scuffs marks on the ground at the scene of the killing suggested that a struggle had taken place).
 

 In summary, the State presented evidence — in addition to the bare fact that the victim was strangled to death — tending to show premeditation. This evidence consisted of (1) the repositioning of the cord around the victim’s neck multiple times and (2) the ample physical evidence indicating that the victim’s strangulation occurred during or immediately after an intense struggle between the killer and the victim. We conclude that this evidence was sufficient for the jury to find beyond a reasonable doubt that the victim’s murder was premeditated. Accordingly, the trial court did not err in denying Mr. Berube’s motion for a judgment of acquittal on the charge of murder in the first degree.
 

 IY. CONCLUSION
 

 For the foregoing reasons, the trial court erred in admitting the
 
 Williams
 
 rule evidence at Mr. Berube’s trial and that error was not harmless. We reverse Mr. Berube’s judgment and sentence and remand this case to the trial court for a new trial on the charge of murder in the first degree.
 

 Reversed and remanded for a new trial.
 

 LaROSE, J., and CANADY, CHARLES T., Associate Judge, Concur.
 

 [1]
 

 .
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959).
 

 [2]
 

 . The father testified that the mirror shook violently, but did not fall. The mother testified that her son told her that the mirror “was falling off the wall.” The boy testified that his parents did not wake up. All three agreed that the time was about 3 a.m.
 

 [3]
 

 . The teenage boy was later shown a photo pack, from which he identified a man with a goatee. The record is unclear concerning whether he actually identified Mr. Berube as the man he saw leaving the adjoining motel room in a hurry.
 

 [4]
 

 .Shortly after leaving the victim’s motel room, Mr. Berube tripped and broke his leg. Mr. Berube was taken to a hospital emergency room for the treatment of his broken leg at approximately 6 a.m. on the morning that the victim was murdered. A report in the emergency room treatment record noted a laceration on the top of his right hand.
 

 [5]
 

 . Mr. Berube told a similar tale to personnel at the hospital emergency room to explain how he had sustained a broken leg.
 

 [6]
 

 . There were multiple ligature marks around the victim’s neck but there was no evidence that her wrists had been bound. During the
 
 Williams
 
 rule hearing, the State claimed that Mr. Berube admitted putting the cord around the victim's neck. Mr. Berube does not appear to dispute this. However, it is not clear from the transcript of the videotaped interrogation in our record if Mr. Berube actually made such an admission.
 

 [7]
 

 . The husband stated that the victim was naked, on her back, on the bed when he found her. This was the position of the victim's body when the police arrived.
 

 [8]
 

 . The trial court was correct in excluding evidence concerning C.D.’s murder, but not for the reasons stated by it. Before evidence of a collateral act may be admitted, the State must prove by clear and convincing evidence that the defendant committed the act.
 
 See McLean v. State,
 
 934 So.2d 1248, 1256 (Fla.2006). In this regard, "mere suspicion is insufficient.”
 
 State v. Norris,
 
 168 So.2d 541, 543 (Fla.1964). At the
 
 Williams
 
 rule hearing, the State proved only that C.D. had been murdered and that Mr. Berube had been named as a suspect in the unsolved murder investigation. However, Mr. Berube was never charged with the murder, and the State did not establish by clear and convincing evidence that he had killed C.D. For that reason, evidence concerning the C.D. murder was inadmissible at Mr. Berube's trial. Contrary to the trial court's analysis, if the State had been able to establish by clear and convincing evidence that Mr. Berube had murdered C.D., evidence concerning that crime would have been the only one of the three crimes the State sought to admit that
 
 might
 
 have been relevant and admissible under section 90.404(2)(a).