**NOT FOR PUBLICATION**

# In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12545
Non-Argument Calendar
_____

ALBERTO RAMOS ALGABA,

*Petitioner-Appellant,*

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

*Respondent-Appellee.*

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-62854-AMC
_____

_____

No. 23-10298
Non-Argument Calendar
_____

ALBERTO RAMOS ALGABA,

*Petitioner-Appellant,*

2                    Opinion of the Court                    22-12545

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

*Respondent-Appellee.*

————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-62854-AMC

————————————

————————————

No. 23-10346
Non-Argument Calendar

————————————

ALBERTO RAMOS ALGABA,

*Petitioner-Appellant,*

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

*Respondent-Appellee.*

————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-62854-AMC

————————————

Before NEWSOM, BRANCH, and BRASHER, Circuit Judges.

PER CURIAM:

Alberto Ramos Algaba is a Florida prisoner serving life imprisonment for the first-degree murder of his wife. After pursuing state postconviction relief, he filed a *pro se* federal habeas petition, pursuant to 28 U.S.C. § 2254, arguing in relevant part that his conviction violated his due process rights because the evidence was insufficient to support his conviction. The district court dismissed the claim as procedurally defaulted. Thereafter, Algaba filed a motion for reconsideration, pursuant to Federal Rule of Civil Procedure 60(b), which the district court dismissed on the ground that it lacked jurisdiction over the motion because Algaba had already filed a notice of appeal. Algaba then filed a motion to reinstate the Rule 60(b) motion, which was denied. Algaba appealed both rulings in separate cases (22-12545 and 23-10346), and we *sua sponte* consolidated the appeals.[1] We granted him a certificate of appealability ("COA") on the dismissal of the due process claim as procedurally defaulted and the denial of the motion to reinstate the Rule 60(b) motion.

---

[1] Algaba also filed a motion for recusal in the district court after the court dismissed his Rule 60(b) motion for lack of jurisdiction. The district court denied the motion for recusal, and Algaba appealed that order, which was docketed as a separate appeal (23-10298). The State moved to consolidate that appeal with this one, and we granted the motion. However, Algaba does not raise any issues in his briefing related to the denial of his motion for recusal. Accordingly, we conclude that he has abandoned any challenge to the denial of his motion for recusal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014) (holding that an appellant abandons a claim when he fails to raise it in his brief).

Algaba argues that the district court erred in (1) concluding that his due process sufficiency of the evidence claim was procedurally defaulted because he established cause and prejudice to overcome the default, and (2) denying the motion to reinstate the Rule 60(b) motion because the district court erroneously concluded that it lacked jurisdiction over the underlying motion due to Algaba's filing of a notice of appeal. After careful review, we affirm the district court's procedural default ruling. As a result, we find it unnecessary to reach Algaba's claim related to the reinstatement of the Rule 60(b) motion.

## I.    Background

In 2012, the state of Florida charged Algaba with the first-degree murder of his wife, Danitza Gomez Reyes. Algaba elected to represent himself at trial, although the court appointed standby counsel to assist him.

Testimony at trial established that, on the morning of September 11, 2012, Algaba used his wife's phone to call his friend, Jorge Rodriguez-Feo, and he told Rodriguez-Feo that he and Gomez Reyes had an argument and he had killed her. He also informed Rodriguez-Feo that he had tried to commit suicide, but he was not successful. Rodriguez-Feo called 911 and relayed what Algaba had told him. Algaba also called 911 and reported, "I've killed my wife. My wife is dead."

Law enforcement responded to Algaba's apartment where they discovered Algaba, who appeared "[d]isheveled" and "agitated" with "visible blood [on] his hands, wrists[,] and neck."

Officers observed "scratches or light wounds on [Algaba's] forearm." They also discovered a significant amount of blood on the bed, several knives on a table next to the bed, and Gomez Reyes's deceased body on the bedroom floor with a pillow over her head. Algaba told the officers that he had tried to kill himself and that the blood on the bed was his.

The medical examiner testified that Gomez Reyes had facial injuries likely caused by trauma. For instance, her left eye was bruised and "swollen shut," her right eye also had bruising, and she had a cut on her lips and scrapes on her face. The medical examiner observed discoloration around Gomez Reyes's knuckles and across the back of her wrist, which was typically consistent with defensive injuries. Gomez Reyes also had bleeding underneath the skin on her face, consistent with blunt force trauma, likely from "several blows" to the head. Although Algaba argued that the trauma to Gomez Reyes's head could have been caused by a fall, the medical examiner denied this possibility because a fall would not explain the trauma to both sides of her head. Upon further questioning, the medical examiner agreed that the injuries could be explained by a fall if she "had fallen or struck a wall or something multiple times on both sides of the head," but that such a scenario was "not the most likely explanation," particularly given that the apartment floor "was carpeted, which would have cushioned the blow [from a fall] to a certain extent." The medical examiner opined that manual strangulation was the cause of death, although he could not rule out that a pillow may have also been used to suffocate her. The medical examiner explained that manual strangulation could

take five minutes or more depending on the pressure applied. The medical examiner indicated that Gomez Reyes died at approximately 10:00 p.m., "give or take two or three hours," on September 10, 2012. The last verified communication from Gomez Reyes on her phone was at 10:56 p.m. on September 9.

Printed e-mail exchanges between Algaba and Gomez Reyes in the weeks leading up to her death were discovered hidden in a picture frame, and those e-mails (as well as a diary kept by Algaba) depicted a great deal of marital troubles and escalating tension between the two. For instance, in one of these e-mails, Algaba "referred to [Gomez Reyes] as a 'whore,'" and a "slut," and he accused her of lying and being unfaithful. He also stated that her "attitude anger[ed] [him]." These documents further revealed that Gomez Reyes wanted to end the marriage.

The state also introduced into evidence audio recordings from a small digital recorder found in the couple's bedroom, which was collected as evidence at the crime scene. The first recording was timestamped September 10, 2012, at 6:08 a.m. and the second was timestamped the same day at 9:04 a.m. In the first recording, Algaba stated:

> I haven't wanted for us to get to this. It's my last recording. I love her. She has done to me everything that I did not want us to do, but, moreover, she fucked up my life. And she wanted to kill me. I didn't want to kill her. She has provoked me. I was sleeping; she has woken me up; she has assaulted me and I have grabbed her by the neck. I know that she isn't dead.

My—the last words that I am hearing from her, she asked me for forgiveness. And I am really sorry. I wanted to have ended my life only, not hers . . . . And she (unintelligible) me; assaulted me. And I grabbed her by the neck. I knew that if I released her she would call the police. Everything would be my fault. Nobody would investigate what had happened up to now. I didn't want to get to this. . . . I love her. I can't live without her. . . . She attacked me and I had to grab her by the neck. And I knew that—that—that if I left her alive, I would have been the bad one. Even so, I have not been capable of finishing her off. . . . But if you all look in, for whoever wants to know the history a little, in my computer, I have the e-mails that I have sent her, and my diary, even though I have abandoned it for some days because I didn't know what to put down. I would only put down what she would do, because the thing is that she wouldn't do anything other [than] fighting with me. . . . . She has provoked me so much.

In the second recording, from which selected excerpts were played, Algaba stated he did not "know how many pills" to take in order to commit suicide. He then proceeded to talk about various random matters before passing out.[2] Two distinct sets of sounds

---

[2] The second recording was approximately two and a half hours long. Initially, when the State sought to introduce excerpts from the recording, Algaba objected and argued that the entire recording needed to be played because there was a segment in which he could be heard snoring for over an hour and his wife could allegedly be heard moaning and breathing in the background,

could be heard in the recording, and the State submitted that one of those was Gomez Reyes who was "struggling for her life and taking her last breaths on that audio."

After the State rested, Algaba moved for a judgment of acquittal on the ground that "the evidence presented [was] not sufficient to support the charge[] made." The trial court denied the motion.

Algaba testified in his own defense. He explained that he and Gomez Reyes had a lot of marital problems, and he did everything he could to avoid fighting with her. He explained that he started saving e-mails and keeping a diary in case he needed them in a future divorce proceeding or a potential civil suit he planned to file for emotional and psychological abuse.

On the night of September 9, Gomez Reyes came home and said that she wanted to talk. To prevent an argument, he grabbed a digital tape recorder to record the conversation because he knew if he was recording her, she would "control herself and be more calm." During their talk, she asked him to leave the apartment,

---

which he argued demonstrated that she was still alive after he grabbed her by the neck and then attempted his suicide. Ultimately, the State admitted the entire recording as an exhibit, but it only played selected excerpts for the jury totaling 19 minutes. The trial court informed Algaba that he could play the whole tape if he so desired during the defense side of the case. Algaba had an off-the-record discussion with standby counsel about this matter. Ultimately, however, Algaba did not present any other excerpts from the tape to the jury, although he maintained that the recordings demonstrated his innocence and a flaw in the state's timeline.

and they argued because he did not have anywhere else to go.  He also accused her of cheating.  He explained that he "wanted . . . her to be patient because [he] had already planned . . . to commit suicide the following week."  He explained that, after they argued, she went into the bedroom, and he fell asleep.  He woke at 4:00 a.m. to discover her sitting in a chair in the corner of the room, and she demanded the tape recorder.  He refused to give her the tape recorder, and they started arguing.  She yelled at him and stated she was "going to kill [him]" and then "threw herself at [him]" and started hitting him.   He explained that, he "instinctively . . . grabbed her by the neck" because he "wanted to . . . get her off [of him]," and he "thr[e]w her down on the sofa." When she did not move, he realized she was unconscious, and he moved her to the bedroom and laid her on the bed because it had better light to be able to see what was happening.  She then regained consciousness and asked him to forgive her for all she had done to him.  He told her he forgave her, and she did not respond.

At that point he decided to commit suicide by mixing pills and alcohol to cause an overdose.  After taking the pills, he went to the kitchen and grabbed five knives, which he then used to cut his wrists and his neck.  He also grabbed the digital recorder because he wanted to document his suicide.  He lost consciousness and when he woke up, he discovered Gomez Reyes dead on the floor. He explained that he told the police that he killed her because he thought she died from him grabbing her by the neck, but then when he learned that she had suffered blows to the head, he knew someone else was responsible because he never hit her.

Furthermore, when he realized that he awoke on the morning of September 11 and not September 10 (the day he had taken the pills and alcohol), he knew she "had not died at [his] hands." Although he did not testify to this information, he opined in his opening statement that someone else came to the apartment while he was unconscious and killed Gomez Reyes.[3]

Following his testimony, Algaba renewed his motion for judgment of acquittal, summarily arguing that the evidence was insufficient. The district court denied the motion.

In closing, Algaba argued that the audio recordings demonstrated his innocence and pointed out alleged flaws in the State's timeline of events. He maintained that someone else killed Gomez Reyes while he was asleep and that she must have let the person into their apartment.

The jury found Algaba guilty of first-degree murder. Algaba filed a *pro se* motion for a new trial, arguing, without further elaboration, that the court erred in denying his motions for judgment of acquittal and that the verdict was not supported by sufficient evidence. The trial court denied this motion. The court sentenced Algaba to life in prison.

Algaba filed a counseled appeal, but he did not challenge the sufficiency of the evidence under either Florida law or the Due

---

[3] In response to his assertion, the State pointed out in its closing that there was no evidence of forced entry into the apartment. Algaba then argued in his closing that his wife must have let the assailant in.

Process Clause. The Florida Fourth District Court of Appeal per curiam affirmed his conviction and sentence.

Algaba then pursued state habeas relief, arguing in relevant part that his appellate counsel was ineffective for failing to raise on appeal that the evidence was insufficient under both Florida law and federal law to support his conviction. The Fourth District Court of Appeal denied the claim on the merits without written opinion, and denied Algaba's request for rehearing and a written opinion.

In 2019, Algaba filed a *pro se* federal habeas petition, pursuant to 28 U.S.C. § 2254, followed by an amended petition. As relevant to this appeal, he argued that his conviction violated his constitutional right to due process because the evidence was insufficient to support the conviction. He acknowledged that he did not raise this claim in the state court. In fact, he conceded that his appellate counsel could not have raised the claim because Algaba failed to properly preserve the sufficiency issue by failing to include the specificity required for a sufficiency challenge in his motions for judgment of acquittal. He further explained that he raised an ineffective-assistance-of-appellate-counsel claim in his state habeas petition based on counsel's failure to raise a sufficiency challenge, but that the claim "was properly denied on the merits because the appellate counsel cannot be deemed ineffective when [the] claim [was] insufficiently specified during the [trial] proceedings."

The State responded that, based on Algaba's own admissions, the claim was procedurally defaulted, and the district court should deny review on that basis. Notwithstanding the procedural bar, the State also argued that the claim failed on the merits.

The district court acknowledged that the claim was procedurally defaulted, but it explained that Algaba could overcome the procedural default if he could show cause and prejudice. The district court explained that constitutional ineffective assistance of counsel can constitute cause to overcome a default provided that the petitioner exhausted the ineffective assistance claim in the state court. It then determined that Algaba was relying on his claim of ineffective assistance of appellate counsel as cause to overcome the procedural default. Without discussing the cause prong further, the district court concluded that Algaba could not demonstrate prejudice to overcome the procedural default because he failed to demonstrate that the underlying claim was meritorious. Accordingly, the district court concluded that the claim was procedurally barred, and it denied a COA on this issue.

Algaba filed a motion for reconsideration, which was denied. Algaba then filed a notice of appeal. However, after he filed his notice of appeal, he filed a motion for relief from judgment in the district court, pursuant to Federal Rule of Civil Procedure 60(b), related to the merits of his due process sufficiency of the evidence claim. The district court dismissed the Rule 60(b) motion

22-12545                Opinion of the Court                13

in a paperless order, concluding that it lacked jurisdiction to address the motion because Algaba had already filed a notice of appeal.

Algaba filed a motion to reinstate the Rule 60(b) motion in which he drew the court's attention to case law providing that, notwithstanding the notice of appeal, the district court retains jurisdiction to consider a Rule 60(b) motion. The district court denied the motion to reinstate without explanation in a paperless order. Algaba filed a notice of appeal.

Algaba sought a COA in this Court, and a judge of this Court granted him a COA on the following issues:[4]

> Whether the district court erred in dismissing Algaba's substantive claim that the evidence did not support his conviction on the ground that he could not establish actual prejudice to excuse his procedural default of the claim in state court, based on appellate counsel's failure to raise the claim in his direct appeal?

> Whether the district court erred in denying Algaba's motion to reinstate his Rule 60(b) motion, after it dismissed the Rule 60(b) motion for lack of jurisdiction because a notice of appeal had been filed?

---

[4] We appointed counsel to represent Algaba in this appeal.

## II.    Discussion

### A.  Sufficiency of the Evidence Claim

Algaba argues that the district court erred in dismissing his sufficiency claim as procedurally defaulted.  He argues that his appellate counsel "was absolutely deficient" for not raising a sufficiency challenge on direct appeal "and there was no reason not to raise" that issue on appeal.  As for prejudice to overcome the procedural default, Algaba points to the entirety of the two and a half hour recording, and argues that the recording reveals a significant "plot hole" in the State's timeline—namely, that Gomez Reyes was still alive after he grabbed her by the neck and then attempted suicide and slipped into unconsciousness.  He asserts that it is entirely unknown what occurred between the time he went unconscious and the time he awoke many hours later to find her dead, such that the State could not prove the requisite premeditation to support a first-degree murder conviction.

"[W]hen reviewing the district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error."  *LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1259 (11th Cir. 2005).  "Whether a petitioner has procedurally defaulted a particular claim is a mixed question of fact and law, which [we] review[] *de novo*."  *Carruth v. Comm'r, Ala. Dep't of Corr.*, 93 F.4th 1338, 1354 (11th Cir.), *cert. denied sub nom.*, *Carruth v. Hamm*, 145 S. Ct. 208 (2024).

Before seeking federal habeas relief under § 2254, a petitioner must exhaust all state court remedies available for

challenging his conviction, either on direct appeal or in a state post-conviction motion.  28 U.S.C. § 2254(b), (c).  "For a federal claim to be exhausted, the petitioner must have fairly presented [it] to the state courts.  The purpose of the exhaustion requirement is straightforward: the petitioner must have given the state courts a meaningful opportunity to address his federal claim."  *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015) (alteration in original) (quotations and citation omitted).  Thus, a federal claim is subject to procedural default where the petitioner never raised the claim in state court and it is obvious that the unexhausted claim would now be procedurally barred under state procedural rules.[5] *Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999).

We may nevertheless review a procedurally defaulted claim if the petitioner demonstrates cause for the procedural default and actual prejudice.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) ("A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation.").

Ineffective assistance of counsel can under certain circumstances constitute "cause" for purposes of overcoming a

---

[5] The parties do not dispute that the unexhausted sufficiency claim is now barred by Florida's procedural rules.  *See Childers v. State*, 782 So. 2d 946, 947 (Fla. 4th DCA 2001) (explaining that a "challenge to the sufficiency of the evidence was an issue for direct appeal, and therefore [is] not cognizable" in postconviction proceedings).

procedural default provided that the ineffective assistance claim has been exhausted in the state courts. *Edwards*, 529 U.S. at 451–52; *see also Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1365 (11th Cir. 2020) (explaining that ineffective assistance of appellate counsel can constitute cause for procedural default). However, attorney error is cause for the procedural default only if the error rises to the level of constitutionally deficient assistance of counsel under the Sixth Amendment.[6]  *Edwards*, 529 U.S. at 451

---

[6] The State argues that Algaba's appellate counsel was not deficient because he could not have raised a sufficiency challenge on direct appeal as Algaba failed to properly preserve the matter in the trial court due to the fact that he filed a bare bones motion for judgment of acquittal and did not provide specific arguments as to why the evidence was insufficient to sustain his conviction. Algaba in turn argues that the State is precluded from raising this argument because (1) it failed to raise this argument in the district court; (2) the State never objected to the boilerplate nature of the motions for judgment of acquittal at trial; and (3) Algaba represented himself *pro se* at trial and *pro se* litigants "have frequently been granted leniency in technical matters" under Florida law. (quotations omitted).  Although it appears that Algaba's counsel likely could not have challenged the sufficiency of the evidence on direct appeal due to the bare bones motions for judgment of acquittal filed by Albaga at trial, we ultimately do not reach this issue. *See Stephens v. State*, 787 So. 2d 747, 753 (Fla. 2001) (holding that a challenge to the denial of a motion for judgment of acquittal "was not preserved for appeal because [the defendant] made a bare bones motion for judgment of acquittal, without any specific argument"); *Griffin v. State*, 705 So. 2d 572, 573 (Fla. 4th DCA 1998) ("A motion for judgment of acquittal which does no more than generally allege that the State has failed to establish a prima facie case is insufficient to preserve the instant issue for appeal.").  As we explain further in this opinion, the COA and the district court's analysis focused on whether the underlying sufficiency claim was meritorious (*i.e.*, the prejudice prong of the cause and prejudice standard), and we confine our analysis to that issue as well.

("Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution."); *Coleman v. Thompson*, 501 U.S. 722, 755 (1991) ("We reiterate that counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation."). To determine prejudice, we look to whether the underlying claim is meritorious. *Sealey*, 954 F.3d at 1366. Because the district court and our COA focused on the prejudice aspect—*i.e.*, whether the underlying claim was meritorious—we do so as well.

The Due Process Clause "prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979). Thus, "[a]s the Supreme Court explained in *Jackson*, a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." *Preston*, 785 F.3d at 462–63 (quotations omitted). In assessing sufficiency of the evidence at this stage, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

We "must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a

matter of federal law."[7] *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (citation and quotation omitted). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." *Id.* (quotations omitted). Thus, "the only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.

In Florida, first-degree murder includes the premeditated murder of another human being. Fla. Stat. § 782.04(1)(a)(1). "Premeditation involves a fully formed conscious purpose to kill which may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." *Kocaker v. State*, 119 So. 3d 1214, 1226 (quotations omitted). Premeditation is a question of fact which can be inferred from circumstantial evidence, including "the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." *Id.* (quotations omitted).

---

[7] To the extent that Algaba argues that Florida's then-existing special burden of proof standard for cases involving circumstantial evidence (which imposed a burden on the State in a circumstantial case to eliminate every reasonable hypothesis of innocence) applies to his federal due process claim, he is incorrect. As we explained at length in *Preston*, Florida's special burden of proof standard "has no place in our sufficiency of the evidence analysis." 785 F.3d at 463–64, 466 (quotations omitted).

Importantly, no set length of time is necessary for there to be premeditation. *Id.*

When, as here, a defendant elects to testify, the jury is free to reject the defendant's version of events. *Walker v. State*, 896 So. 2d 712, 720 & n.6 (Fla. 2005); *see also Figueroa-Sanabria v. State*, 366 So. 3d 1035, 1051 (Fla. 2023) ("When a defendant testifies on his version of events, the jury is free to reject his version of events as unreasonable, and in turn may view this testimony as evidence of a guilty mind." (citation and quotations omitted)). And "[w]hen the record reflects facts that support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant." *Preston*, 785 F.3d at 463 (quotations omitted).

Here, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence from which the jury could have found premeditation and concluded that Algaba committed the first-degree murder of Gomez Reyes. For instance, the jury heard the 911 call in which Algaba stated that he had killed his wife, which was consistent with the statements that he made to Rodriguez-Feo the morning of the murder. There was also evidence of marital troubles, escalating acrimony between the two, and that Gomez Reyes had asked Algaba to leave the apartment, and he had nowhere else to go. Additionally, the jury heard Algaba's self-recorded statement in which he admitted grabbing her neck after she attacked him on the morning of September 10. In this recording, he also stated that he knew that "if [he] released

her she would call the police" and "[e]verything would be [his] fault, and that "[he] knew that—that—that if [he] left her alive, [he] would have been the bad one." The medical examiner explained that manual strangulation could take five minutes or more depending on the pressure applied. Moreover, although the medical examiner testified that Gomez Reyes died from manual strangulation, he also confirmed that she had defensive wounds and had suffered several blows to the head. The jury could have inferred the necessary premeditation based on all of this evidence. *See Kocaker*, 119 So. 3d at 1226 (explaining that the jury can infer premeditation from circumstantial evidence, including "the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted" (quotations omitted)); *Berube v. State*, 5 So. 3d 734, 745 (Fla. 2d DCA 2009) ("Proof of a struggle between the killer and the decedent in a case of murder by strangulation constitutes evidence which will support a jury finding of premeditation."); *Yinger v. State*, 409 So. 3d 201, 205 (Fla. 1st DCA 2025) (explaining that a jury could have inferred premeditation based in part on the fact that the victim suffered blunt force trauma as well as ligature strangulation and on the coroner's testimony which established that strangulation takes a few minutes).

Although Algaba testified in his own defense and maintained that Gomez Reyes was still alive after he grabbed her by the neck and then attempted suicide and that someone else must have entered the apartment and killed her while he was in a pill-induced

sleep, the jury was free to reject his version of events. *Walker*, 896 So. 2d at 720 & n.6. Indeed, the jury could have drawn adverse inferences of his guilt from his testimony. *See Figueroa-Sanabria*, 366 So. 3d at 1051 ("When a defendant testifies on his version of events, the jury is free to reject his version of events as unreasonable, and in turn may view this testimony as evidence of a guilty mind." (citation and quotations omitted)).

Algaba also relies heavily on the alleged time gap between his self-recorded statements on the morning of September 10—in which he claims sounds in the background from Gomez Reyes post-strangulation demonstrate she was alive—and Gomez Reyes's time of death as estimated by the medical examiner on the night of September 10. However, he made these arguments to the jury, and it was up to the jury to resolve any conflicts in the evidence. *Preston*, 785 F.3d at 463 (explaining that we presume "that the jury resolved those conflicts in favor of the prosecution and against the defendant" (quotations omitted)); *see also Coleman*, 566 U.S. at 655 ("*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." (quotations omitted)). Based on this record, the jury's finding of premeditation beyond a reasonable doubt "was [not] so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.

Accordingly, because Algaba cannot show that the underlying due process claim was meritorious, he cannot establish

prejudice to overcome the procedural default.    Therefore, we affirm the district court.

### B. Reinstatement of the Rule 60(b) motion

Algaba argues that the district court erred in denying his motion to reinstate the Rule 60(b) motion.  However, because we conclude for the reasons explained above that the district court properly dismissed the sufficiency claim as procedurally defaulted, we need not reach this issue.  Even if the Rule 60(b) motion were reinstated, it would be moot because we have already determined that the underlying sufficiency claim which was the subject of the Rule 60(b) motion is not meritorious.

**AFFIRMED.**