PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the conviction and sentence.
FACTS AND PROCEDURAL HISTORY
Guilt Phase
On November 17, 2004, Genghis Kocaker was indicted for the first-degree murder of Eric Stanton. On the night of August 31, 2004, Stanton, a cab driver, was hailed by Kocaker about one-third of a mile from an Eckerd Drug Store in Clearwater, Florida. Stanton’s cab went out of service twenty-eight minutes after Stanton picked up Kocaker. On September 1, 2004, at 7:11 a.m., Kocaker placed a telephone call to 911 from a cell phone in the Eckerd’s store parking lot to report that there was a dead person — or a person who appeared to be dead — inside of a cab. In this call, which was played at trial for the jury, Kocaker conveyed to the dispatcher that he discovered the body by happenstance and failed to tell the dispatcher that he had ridden in the cab hours before. Ko-caker explained that he noticed items on the ground near the cab, including change, and then proceeded to look through the crack of the cab’s door. Kocaker told the dispatcher and the crime scene investigators that he needed to leave the scene because he might get into some trouble if he got involved. The first responders observed a deceased person — later identified as Stanton — lying on his back partially across the front seat of the cab.
It was determined that the inside of the cab had been set on fire, with the windows rolled up and the doors closed. A partially burnt wick was discovered on the passenger side, a burnt wick was stuck inside the neck of the gas tank, and a gas can was found in the front seat. Detective Karl Cruise opined that the fire most likely started on the floorboard area behind the passenger seat. Nothing in the outward appearance of the cab seemed unusual as a person would have been unable to see through the cab’s windows from the outside due to an accumulation of soot, and the cab was parked properly. The State showed that Kocaker had prior knowledge that Stanton was deceased as he said, *1218 “there’s a dead guy in a cab,” to the 911 dispatcher before reaching the cab.
Stanton’s blood was found in the cab’s trunk. A cut seatbelt, taken from the front passenger seat, was discovered in the trunk and also contained Stanton’s blood. A forensic specialist presumed that the seatbelt was used to tie up Stanton. The cab’s backseat had been pushed forward and set into the down position which blocked access to the rear doors’ handles. The forensic specialist testified that Stanton had pushed down the backseat when he moved from the trunk to the front of the cab. There were smears found on the interior of the windows, which indicated that Stanton was moving around.
The medical examiner testified that Stanton had first and second degree burns on his face and extremities, a stab wound on his back most likely caused by a knife, and an incised wound across his neck. The medical examiner opined that Stanton’s main cause of death was carbon monoxide with the contributing cause being the stab wound which was a major injury and would have been fatal without medical treatment. The medical examiner testified that Stanton was breathing during the fire because of the presence of soot in his trachea, but could not state whether Stanton was conscious.
A medium gray Fruit of the Loom t-shirt covered in Stanton’s blood was found on the backseat of the cab.[1] The State showed that Kocaker’s sister had purchased Kocaker’s clothes during the summer of 2004,[2] including a medium gray Fruit of the Loom t-shirt, which could not be located in her house after the murder. Detective Thomas Klein did find a medium black Fruit of the Loom t-shirt in Kocaker’s bedroom. The gas can found inside the cab was identified at trial as the gas can that was missing from Kocaker’s sister’s home.[3]
Detective James Beining testified about Kocaker’s initial statement to the police pertaining to his discovery of Stanton’s body. In his statement, Kocaker said that he walked through the front of the Eckerd store on his way home and then noticed items on the ground, including change and a driver’s license. Kocaker observed that the cab door was slightly cracked open. Kocaker looked through the window and saw a man laid out on the seat. Upon opening the door, Kocaker discovered that the man was deceased. Kocaker then dialed 911. Eckerd’s surveillance camera video refuted Kocaker’s statement of the particular route he claimed to have taken before he approached Stanton’s body, as the video showed Kocaker coming from the back of the Eckerd store. During this initial statement, Kocaker failed to mention that Stanton picked him up after he hailed his cab. Kocaker was at first unable to account for his time on the night in question, but he later told Detectives Klein and Keith Johnson that he went to an Albertson’s, and met some people at a Wal-Mart who he partied with all night.[4] Kocaker did not volunteer the names of these individuals.
*1219 The State also presented evidence that a few days before Stanton was murdered, Kocaker began purchasing crack cocaine from Antoine Powell. After running out of money, Kocaker tendered a necklace and a ring to Powell for more crack cocaine and told Powell that he intended to pay him for the return of his jewelry once he had the money. Powell testified that on August 31, 2004, Kocaker specifically told him that he wanted to have the jewelry returned later that night. According to Powell, on August 31, 2004, between 10:30 p.m. and 11:00 p.m., he received a call from Kocaker and was told to meet him at a Walgreen’s — across the street from the Eck-erd store — in fifteen minutes’ time. Powell and Stephanie Brzoska subsequently picked up Kocaker at the Walgreen’s. Powell testified that Kocaker was counting money in the backseat during the ride. Stephanie testified at trial that during the car ride, Kocaker said, “Don’t believe everything you hear on the radio or see on TV.” They drove to a laundromat, and only Powell and Kocaker went inside. Powell observed Kocaker shaking and acting jittery, and he testified that Kocaker was wearing a white shirt with a lot of blood on it and said that he needed to clean it. Further, according to Powell’s testimony, Kocaker asked him if he knew anyone who “want[ed] some killers on their team[?]” Powell responded, “What’d you do, rob somebody, kill somebody?” and Kocaker responded, “That’s what I do.” Powell and Stephanie then dropped off Kocaker at the Bellaire Motel.
Thereafter, Powell and Stephanie retrieved the jewelry that Kocaker previously gave to Powell. Powell and Stephanie then picked up Kocaker, who was in different clothes. Kocaker possessed a bag which contained shoes, a shirt, and pants. Kocaker then gave Powell money in exchange for the jewelry. Powell testified that Kocaker exited the car with his bag and walked in between a 7-Eleven store and a laundromat, thereafter returning without the bag.[5] Powell and Stephanie then dropped Kocaker off again at the motel. Powell admitted at trial that he was previously convicted of sixteen or seventeen felonies.
Heidi Kalous testified that Kocaker had told her a few days before the murder that he had a knife in his motel room. Heidi also testified that on the night in question she observed Kocaker in a motel room wearing a white shirt inside out with blood all over it. Kocaker explained to Heidi that he had gotten into a fight; he then showered in the motel room and received a blue shirt from a man named Alvin. Later that night, Kocaker showed up at Heidi’s house and requested a change of clothes.
The State also offered the testimony of Paul Sands, who testified to incriminating statements made by Kocaker. In November of 2004, both Kocaker and Sands were detained in a holding cell prior to being 'transported to the Pinellas County Jail. According to Sands, Kocaker told him that he was scared and did not want to return to Pinellas County because “he’d be going ,up the row for a long time.” Kocaker had also told Sands that he did not want to get the death penalty. In addition, Kocaker said that he had “burned somebody,” and that he “had to do what [he] had to do, it’s justified.” Finally, Sands testified that after Kocaker had a telephone conversation with his sister from jail, Kocaker stated, “I wish I could kill that bitch, too.” Sands admitted to having six prior felony convictions.
*1220 Kocaker, a fifteen-time convicted felon, testified as the only defense witness. Ko-caker admitted at trial that on the night in question he flagged down Stanton’s cab from a store and told him to drive to the Bellaire Motel so that he could party.[6] Stanton told Kocaker that he would not charge him for the cab ride if Kocaker could “hook him up” with a female at the motel, according to Kocaker. Upon arriving at the motel, Kocaker was unsuccessful in locating any females. Kocaker returned to the cab and saw Stanton with a female in the backseat. Stanton then furnished his cab keys to Kocaker. Kocaker drove the cab to a store to get cigarettes while Stanton and the female were “messing around.” Kocaker maintained that after driving the cab back to the motel he went inside a motel room while Stanton and the female remained in the cab. Kocaker asserted that he had no further contact with Stanton that night, but noted that a little while later he left the motel room and noticed a loud argument taking place inside of the cab although he could not see anything. Kocaker thought that he had heard Powell’s voice coming from inside of the cab; Kocaker “shot back” to the motel room. Powell picked up Kocaker a little while later and they both went to a store.
As to his discovery of Stanton’s body, Kocaker testified that on his way home from the motel he cut through the Eckerd store parking lot and discovered Stanton’s belongings, including his driver’s license. Kocaker saw the cab, observed that the door was cracked, looked inside, and saw Stanton lying there. Kocaker acknowledged at trial that he wore a light colored t-shirt on the night in question, but denied that it contained blood. Kocaker “guessed” that the gray t-shirt found inside the cab was his, but maintained that he had given the gray shirt and pants to a woman named Crissy because she had ripped her clothes. Kocaker further testified that he put Crissy’s ripped clothes, along with his shoes, inside of a bag.
On cross-examination, Kocaker asserted that the money he was counting when he was picked up by Powell and Stephanie was from his savings which he kept at home. Kocaker did not understand the surveillance video which showed him making the telephone call to 911 before he got to the cab and discovered Stanton’s body. Kocaker said that he did not know at that time whether he was making a call, getting ready to make a call, or if someone was calling him.[7] Also, Kocaker suggested that Powell could have known about the gas can belonging to Kocaker’s sister because Powell might have dropped him off at home before.[8] Finally, Kocaker admitted on cross-examination that at times he had possessed a knife. The trial judge instructed the jury on both premeditated murder and felony-murder. On June 12, 2008, the jury convicted Kocaker of first-degree murder.
Penalty Phase
The State presented evidence that Ko-caker was on felony probation at the time of the murder; that he was previously convicted of a felony involving the use or *1221 threat of violence to a person, to wit: a manslaughter conviction in 1981, and nine armed robberies beginning in 1990; and that the murder was especially heinous, atrocious, or cruel (HAC). As to the defense’s presentation of evidence, Dr. Frank Wood, a neuroscientist and neuropsychologist, testified that Kocaker’s brain was abnormally shaped since birth in that the right hemisphere was smaller than the left to a degree that exceeded normal limits, and there was evidence of reduced sugar consumption in the right hemisphere. A radiologist testified that it was possible that Kocaker’s brain had infections attributable to HIV.
Kocaker testified that he learned he had HIV in 1995. He testified that he grew up in Florida; went to Vietnam; had never been in snow or lived in Puerto Rico; and that his mother cleaned offices for a living. Kocaker testified that he was born blind in one eye. This testimony conflicted with Kocaker’s sister’s testimony, who said that he did live in Puerto Rico, that she and Kocaker grew up in New York, and that he would go skiing with his family in Vermont or New Hampshire during the winters. Dr. Eisenstein, a psychologist, spent approximately ten hours with Kocaker in 2007. Kocaker reported that he was a helicopter pilot in Vietnam, but Dr. Eisenstein confirmed that such was untrue. Ko-caker also told Dr. Eisenstein that he was born and basically grew up in Florida, although Kocaker’s sister reported that he was born and raised in New York. In addition, Kocaker’s sister reported that their mother was an executive secretary for the United Nations and that Kocaker’s eye injury was from an accident that occurred while he was incarcerated.
Kocaker also reported to Dr. Eisenstein that he was hearing voices which instructed him to hurt himself. Kocaker received a full scale IQ score of 70, and additional testing indicated generalized cognitive slowing and some problems with right brain functioning. Kocaker scored within the brain damage range on a frontal lobe test. Kocaker’s projective drawings were also descriptive of an individual who was depressed and had an abnormal upbringing. Kocaker’s sister reported to Dr. Eisenstein that Kocaker had sustained two head injuries while growing up in New York.[9] Dr. Eisenstein concluded that Ko-caker has brain and neuropsychological abnormalities, diagnosed him with dissociative identity disorder, noted that Kocaker presents multiple different personalities, and believed he was suffering from a mental illness or some abnormalities at the time of the murder. Dr. Eisenstein also believed Kocaker suffered from physical or sexual abuse, and had a long history of alcohol abuse.[10] After giving his competency report, Dr. Eisenstein diagnosed Kocaker with a mental health disorder. Dr. Eisenstein was not sure whether Ko-caker had delusions at the time of the murder, but believed that Kocaker had severe psychiatric conditions at that time based on Kocaker’s sister’s observations.[11] A psychologist who conducted testing on Kocaker reported that he swallowed razor blades at one point, which indicated to Dr. Eisenstein that Kocaker was hearing voices ordering him to hurt himself. At the conclusion of the penalty phase, the jury recommended a death sentence by a vote of 11 to 1.
Spencer Hearing
*1222 During the Spencer[12] hearing, Dr. Carpenter, testifying for the defense, stated that he thought Kocaker was psychotic at the time of his competency evaluation. After reviewing Kocaker’s records, Dr. Carpenter testified that he believed the better diagnosis for Kocaker would be schizophrenia, paranoid type. Dr. Carpenter also found that Kocaker had a positive history for mental illness dating back to the 1980s. Dr. Eisenstein testified that he diagnosed Kocaker with schizophrenia, paranoid type and intermittent explosive disorder. Dr. Eisenstein also found that Kocaker has brain damage, which leads to extreme mental and emotional disturbance.
Kocaker had attempted suicide in 1979 and 1982, and he was hospitalized in a psychiatric unit in 1982 for swallowing razor blades. In 1982, Kocaker was diagnosed with aggressive conduct disorder, undersocialized type. Dr. Carpenter testified that in March of 2006, Kocaker was transferred to a hospital after he went into what was described as a catatonic state; a CAT scan was performed which resulted in positive findings for brain abnormalities. In March of 2006, Kocaker also self-reported five previous suicide attempts. Dr. Eisenstein opined that Kocaker had diminished intellectual and mental abilities. Hospital records revealed that Kocaker had indications of possible organic brain hallucinations, HIV, post-catatonic state, depressive disorder, and a history of right eye blindness. In April of 2006, Kocaker reported hearing auditory hallucinations and he was diagnosed with depressive disorder nonspecified. In May of 2006, Ko-caker was diagnosed with depressive and psychotic disorder. Dr. Eisenstein was of the opinion that the onset of schizophrenia manifested in Kocaker before 2006, despite an absence of records of reporting auditory hallucinations when in his early twenties. In January of 2007, Kocaker reported hallucinations within the preceding ninety days. In February of 2007, Kocaker was diagnosed with schizoaffective disorder. Kocaker reported taking Depa-kote, an antipsychotic medication.
On October 9, 2008, Dr. Gamache, a psychologist, evaluated Kocaker. Dr. Ga-mache, testifying for the State, opined that there was no indication that Kocaker was intellectually impaired. As to the testing, Dr. Gamache found that there was credible evidence that Kocaker was not putting forth a full or an appropriate amount of effort. Dr. Gamache refuted that Depa-kote is an antipsychotic medication, and testified that Kocaker does not suffer from a mental illness other than drug and alcohol abuse, and there was no credible evidence that Kocaker suffers from any type of psychotic disorder. According to Dr. Gamache, there was no indication of schizophrenia symptoms, as Kocaker did not exhibit or describe the type of hallucinations experienced by paranoid schizophrenics, and there was no indication that Kocaker ever had paranoid delusions. Dr. Gamache testified that Kocaker’s supposed delusional thinking cannot support a diagnosis for both dissociative identity disorder and paranoid schizophrenia. Finally, Dr. Gamache opined that paranoid schizophrenics do not experience catatonia, and that the key abnormal finding from Kocaker’s catatonic episode in March of 2006 was a B-12 vitamin deficiency.
Between 1992 and 2006 there were no Florida Department of Corrections (DOC) medical records for Kocaker. However, in light of the subsequent discovery of approximately 3,000 pages of medical records from the DOC, a second part to the Spencer hearing was conducted. Dr. Eisenstein testified that both statutory mental miti- *1223 gators were present, and that his conclusions about Kocaker had not changed upon review of the additional records.[13] For example, a biopsychosocial assessment in May of 2003, revealed that Kocaker was diagnosed as having major depressive disorder, recurrent, with psychotic features, and the medications referenced in the assessment were antipsychotic medications. Kocaker reported hearing voices throughout his life to Dr. Eisenstein. Dr. Eisenstein testified that Kocaker’s auditory hallucinations told him to commit suicide and that the suicide attempts were a manifestation of the psychotic process. In keeping with his earlier diagnoses, Dr. Eisenstein believed that Kocaker has paranoid schizophrenia, dissociative identities disorder, and intermittent explosive disorder. Dr. Eisenstein admitted that there was no diagnosis in the record for any type of schizophrenia, borderline personality disorder, dissociative identity disorder, or intermittent explosive disorder, or any instance where someone had documented delusions or hallucinations.
After reviewing over approximately 500 pages, Dr. Gamache testified that Kocaker was able to earn his GED while in prison, which would not be typical of someone with an extremely low IQ. Kocaker also obtained an IQ score of 89 while in prison. Dr. Gamache again did not find a reference in the record to delusions or hallucinations. Dr. Gamache testified that malingering or manipulation could have been other explanations for Kocaker’s swallowing of the razor blades. Dr. Gamache did not find any evidence to support a diagnosis of dissociative identity disorder. Although Dr. Gamache agreed that the effects of Kocaker’s drug use were relevant to his behavior, he did not believe that Kocaker historically suffered from a condition that he could infer existed at the time of the crime and that would have rendered him unable to conform his conduct or unable to appreciate the wrongfulness of his actions outside the effects of the drug abuse. Dr. Gamache also disagreed with Dr. Eisenstein’s characterization that some of the drugs Kocaker was taking were antipsychotic medications.
On December 21, 2009, the trial court sentenced Kocaker to death. The trial court determined that the State had proven beyond a reasonable doubt the existence of the following statutory aggrava-tors: (1) Kocaker was on felony probation at the time of the murder, § 921.141(5)(a), Fla. Stat. (2004) (great weight); (2) Kocaker was previously convicted of felonies involving the use of violence, § 921.141(5)(b), Fla. Stat. (2004) (a 1982 conviction for manslaughter, and eight armed robbery convictions in 1990) (great weight); and (3) HAC, § 921.141(5)(h), Fla. Stat. (2004) (great weight).
The trial court found that none of the statutory mitigators had been established. Eleven nonstatutory mitigating circumstances were established: (1) Kocaker’s mental health issues (moderate weight); (2) Kocaker’s loving relationships with family members (some weight); (3) Kocaker’s history of alcohol and drug abuse (some weight); (4) Kocaker was under the influence of alcohol at the time of the crime (some weight); (5) Kocaker’s brain damage (some weight); (6) Kocaker was sexually abused as a child (some weight); (7) Kocaker is HIV positive (some weight); (8) Kocaker called 911 to report the murder (very little weight); (9) Kocaker’s birth *1224 father was absent (some weight); (10) Ko-caker suffered head injuries as a child (very little weight); and (11) Kocaker could not focus as a child due to possible A.D.D. (very little weight).[14] The trial court concluded that the established aggravating circumstances were “horrendous” and greatly outweighed “the comparatively insignificant mitigating factors.” Moreover, the trial court gave great weight to the jury’s advisory sentence of the death penalty. This direct appeal followed.
ANALYSIS
Kocaker raises the following claims on appeal: (1) that the evidence presented at trial was insufficient to support the first-degree murder conviction; (2) the death sentence is not proportionate; (3) Florida’s protocol for execution by lethal injection is unconstitutional; and (4) Florida’s capital sentencing process is unconstitutional. We discuss each claim in turn.
Sufficiency of the Evidence
This Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Blake v. State, 972 So.2d 839, 850 (Fla.2007); Fla. R.App. P. 9.142(a)(5). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (citing Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999)).
Kocaker asserts that the circumstantial evidence presented in this case was insufficient to support the first-degree murder conviction. Kocaker moved for a judgment of acquittal at the end of the State’s case-in-chief, arguing that the evidence did not prove that Kocaker was the murderer and that the murder was premeditated or committed during an enumerated felony. Kocaker further asserted that the witnesses who testified about Ko-caker’s statements were not credible. The trial court denied Kocaker’s motion for a judgment of acquittal, finding that “a plethora of circumstantial evidence ... [was] enough to get [the ease] to a jury, in the light most favorable to the State.” At the conclusion of the guilt phase, Kocaker again moved for a judgment of acquittal, which the trial court also denied. We review the denial of a motion for judgment of acquittal de novo. Pagan v. State, 830 So.2d 792, 803 (Fla.2002).
As a preliminary issue, this Court must first determine whether the evidence offered at trial by the State was circumstantial evidence, direct evidence, or a combination of both. Where the evidence is purely circumstantial, there must be sufficient evidence establishing each element of the charged offense which also excludes the defendant’s reasonable hypothesis of innocence. “Direct evidence is evidence which requires only the inference that what the witness said is true to prove a material fact.... Circumstantial evidence is evidence which involves an additional inference to prove the material fact.” Charles W. Ehrhardt, Florida Evidence § 401.1 (2012 ed.); see also McCormick, Handbook of the Law of Evidence § 185 (6th ed. 2010) (“Direct evidence is evidence which, if believed, resolves a matter in issue. Circumstantial evidence also may be testimonial, but even if the circumstances depicted are accepted as true, ad *1225 ditional reasoning is required to reach the desired conclusion.”).
It is well established that confessions are direct evidence. Meyers v. State, 704 So.2d 1368, 1370 (Fla.1997); see also Simpson v. State, 3 So.3d 1135, 1147 (Fla.2009) (holding that the case was not entire ly circumstantial in light of evidence that the defendant confessed to killing victims). A confession is defined as “an admission of guilt and not an admission of a fact or circumstance from which guilt may be inferred.” Bates v. State, 78 Fla. 672, 84 So. 373, 376 (1919). This admission of guilt does not apply to statements or declarations of independent facts from which guilt may be inferred. Louette v. State, 152 Fla. 495, 12 So.2d 168, 172 (1943).
The State argues that Koeaker’s conviction is supported by both direct and circumstantial evidence. Specifically, the State asserts that Koeaker’s statements to Sands were direct evidence of Koeaker’s guilt. Moreover, the State contends that the surveillance video showing Kocaker making the 911 telephone call before he could see into the cab was direct evidence of his guilty knowledge. However, Koeaker’s statement that he “burned somebody” requires an inference, albeit a small one, that the “somebody” he burned was Stanton. Koeaker’s statement was not in response to questioning about a specific crime concerning a specific victim. Instead, this statement is direct evidence that Kocaker burned an unknown person. Because we find that Koeaker’s statements to Sands were not a confession to the murder of Stanton, Koeaker’s statements to Sands cannot be classified as direct evidence of guilt. As to the video showing Koeaker’s 911 telephone call, the video is direct evidence of Koeaker’s knowledge of Stanton’s body being inside of the cab, but does not constitute direct evidence that Kocaker was the perpetrator of the murder. Accordingly, we find that the State failed to present direct evidence that it was Kocaker who killed Stanton. In other words, the State’s case was wholly circumstantial.
In light of our conclusion that the State’s case consisted of entirely circumstantial evidence, we next discuss the applicable standard of review of a motion for judgment of acquittal in a wholly circumstantial case:
[T]he trial court must determine whether there is a prima facie inconsistency between the evidence, viewed in light most favorable to the State, and the defense theory or theories. Under the circumstantial evidence standard, when there is an inconsistency between the defendant’s theory of innocence and the evidence, when viewed in a light most favorable to the State, the question is one for the finder of fact to resolve and the motion for judgment of acquittal must be denied ... “The state is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the Defendant’s theory of events.” If the State has presented evidence to support every element of the crime, then a motion for judgment of acquittal must be denied and the denial affirmed on appeal.
Durousseau v. State, 55 So.3d 543, 556-57 (Fla.2010) (quoting State v. Law, 559 So.2d 187, 189 (Fla.1989) (citations omitted)), cert. denied, — U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011). As noted previously, the jury in this case was instructed on both premeditated murder and felony-murder. Because the guilty verdict was rendered on a general form, the evidence must support either premeditated murder or felony-murder. Dessaure v. State, 891 So.2d 455, 472 (Fla.2004).
*1226 “The unlawful killing of a human being ... [w]hen perpetrated from a premeditated design to effect the death of the person killed or any human being,” constitutes first-degree premeditated murder. § 782.04(l)(a)l., Fla. Stat. (2004). Premeditation involves a “‘fully formed conscious purpose to kill’ which may be ‘formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.’ ” Evans v. State, 838 So.2d 1090, 1095 (Fla.2002) (quoting Woods v. State, 733 So.2d 980, 985 (Fla.1999)). Moreover, this Court has held:
Premeditation, like other factual circumstances, may be established by circumstantial evidence. Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted. It must exist for such time before the homicide as will enable the accused to be conscious of the nature of the deed he is about to commit and the probable result to flow from it in so far as the life of his victim is concerned. No definite length of time for it to exist has been set and indeed could not be.
Larry v. State, 104 So.2d 352, 354 (Fla.1958) (citations omitted). Here, the trial testimony established that Stanton was stabbed in various places. While still alive, Stanton was placed in the trunk of the cab he was driving. Cut seatbelts from the front of the cab were found in the trunk, and investigators presumed they had been used to tie up Stanton. The cab was set on fire. Stanton was eventually able to free himself from the trunk through the backseat of the vehicle, but ultimately died from a combination of his stab wounds and carbon monoxide poisoning. Leaving a wounded, living victim trapped in a burning vehicle is sufficient evidence from which to infer premeditation. Additionally, the location of the stab wound which would have been fatal without medical treatment would also support a finding of premeditation. See Miller v. State, 42 So.3d 204, 228 (Fla.2010) (concluding that the location of the stab wounds to the victim’s vital organs can support a finding of premeditation), cert. denied, — U.S. -, 131 S.Ct. 935, 178 L.Ed.2d 776 (2011). Therefore, the manner in which the homicide was committed is evidence from which premeditation could be inferred. Moreover, the evidence of the burning vehicle sufficiently demonstrated that the murder had occurred during an enumerated felony — arson. See § 782.04(l)(a)2., Fla. Stat. (2004). There was no dispute that Stanton died during, and as a result of, the gasoline-fueled fire that had been purposefully set. Because the State presented sufficient evidence of each element of first-degree premeditated murder and felony-murder, we affirm the trial court’s denial of Kocaker’s first motion for judgment of acquittal.
As detailed above, Kocaker testified that he left Stanton in the cab with a female, and later returned and heard people arguing inside the cab, which he believed to have included Powell. The next time Ko-caker saw Stanton, according to his testimony, was when he found the body inside the cab in the Eckerd’s parking lot. Ko-caker renewed his motion for judgment of acquittal, which was denied by the trial court.
A motion for judgment of acquittal must be denied, and that denial affirmed on appeal, where the State has presented evidence to support every element of the crime. Durousseau, 55 So.3d at 557. The evidence presented in this case must be *1227 inconsistent with any reasonable hypothesis of innocence. See Jackson v. State, 25 So.3d 518, 531 (Fla.2009). At trial, it is “the jury’s duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.... [Wjhere there is substantial, competent evidence to support the jury verdict, that determination will not be disturbed by the courts.” Durousseau, 55 So.3d at 557.
Two witnesses testified that the gas can discovered in the cab was the can that was missing from Kocaker’s sister’s home. A gray t-shirt which was similar to the type of shirt Kocaker’s sister had bought for him was found in the backseat of the cab. Kocaker’s testimony is inconsistent with the surveillance video showing him making the 911 telephone call. Ko-caker testified that he walked through the Eckerd’s parking lot, noticed the cab, looked inside the cab, and called 911 when he saw Stanton’s body. However, Kocaker is seen on the surveillance video walking around the back of the Eckerd’s building, pulling out his cell phone, and calling 911 before he reached the cab. The State established that Kocaker would have been unable to see inside the cab by looking through the windows. The State showed, therefore, that Kocaker possessed knowledge that Stanton was deceased before he had approached the cab. Moreover, Kocaker could not explain why the surveillance video showed him making the call to 911 before he reached the cab.
In addition, Kocaker’s statements in the presence of Sands and at the time of the crime implicated him in the murder. Ko-caker told Sands that he “burned somebody” and that it was “justified.” He also stated that he wished he could kill his sister “too,” which could indicate that Ko-caker wished to kill his sister in addition to Stanton. Moreover, around the time of the murder, Kocaker responded, “That’s what I do,” to Powell’s question of whether he had robbed or killed someone. Kocaker told Heidi days before the murder that he possessed a knife. Kocaker also stated that the shirt he voluntarily gave to Crissy had no blood on it when he gave it to her. Powell and Stephanie testified that they picked him up at a Walgreen’s and noticed Kocaker wearing a bloody shirt. Heidi testified that Kocaker’s shirt had blood all over it and he had to borrow a change of clothes from Alvin. Finally, Powell and Stephanie observed Kocaker counting money after he was picked up at the Walgreen’s. In sum, Kocaker’s version of events was inconsistent with the testimony provided by the State’s witnesses.
The jury could conclude that Kocaker robbed, stabbed, and placed Stanton in the trunk between the time Kocaker hailed the cab and the time he was picked up at the Walgreen’s as Kocaker then had the money to pay Powell for the return of his jewelry. Although Kocaker argues that Powell and the women he associated with all had significant credibility issues, it is the jury’s duty to determine the credibility of trial witnesses. See Barnes v. State, 93 So.2d 863, 864 (Fla.1957) (“[T]here [is no] legal principle more firmly established in our system of jurisprudence than that which makes the jury the sole arbiter of the credibility of the witnesses (except where contrary to demonstrable physical facts).”).
In light of the foregoing, we deny Ko-caker’s insufficiency of the evidence claim because we find that the evidence sufficiently established each element of first-degree murder, premeditated and felony-murder. Additionally, the evidence was inconsistent with Kocaker’s hypothesis of innocence that another individual committed the murder. We conclude that competent, substantial evidence supports the *1228 second denial of Kocaker’s motion for judgment of acquittal and his murder conviction.
Proportionality
“Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review.” Hurst v. State, 819 So.2d 689, 700 (Fla.2002). In performing this review:
“[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails “a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” In other words, proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
Williams v. State, 37 So.3d 187, 205 (Fla.2010) (quoting Offord v. State, 959 So.2d 187, 191 (Fla.2007)). This Court is required to conduct a proportionality review “in order to prevent the imposition of unusual punishments under the Florida Constitution.” Phillips v. State, 39 So.3d 296, 305 (Fla.2010).
“A trial court may properly reject a proposed mitigating circumstance where there is competent, substantial evidence in the record to support its rejection.” Ault v. State, 53 So.3d 175, 189 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 224, 181 L.Ed.2d 124 (2011). “[E]ven expert opinion evidence may be rejected if that evidence cannot be reconciled with other evidence in the case.” Id. (quoting Coday v. State, 946 So.2d 988, 1003 (Fla.2006)). “A trial court has the discretion to reject a statutory mitigator where one expert’s testimony is rebutted by that of another.” Zommer v. State, 31 So.3d 733, 749 (Fla.2010) (citing Walker v. State, 707 So.2d 300, 318 (Fla.1997)). Moreover, “judgments of credibility are within the trial court’s purview.” Zommer, 31 So.3d at 749 (quoting Jones v. State, 966 So.2d 319, 330 (Fla.2007)). “This Court’s function ... is not to reweigh the mitigating factors against the aggravating factors; that is the function of the trial judge.” Blake v. State, 972 So.2d at 846.
In this case, the jury recommended that Kocaker be sentenced to death by a vote of 11 to 1. The trial court properly found three aggravating circumstances, felony probation,[15] HAC,[16] and pri- or violent felony,[17] and gave each great weight. Kocaker did not contest these aggravators. The trial court found that Kocaker had not established any statutory *1229 mitigators, but found that eleven nonstatu-tory mitigators had been established.
Kocaker maintains that the imposition of the death sentence in his case is disproportionate because his crime, while substantially aggravated, is mitigated by the fact that he has severe mental health issues. He also asserts that he has a variety of other mitigators, including brain damage, sexual abuse as a child, alcohol abuse problems, being HIV positive, having an absent father, and having family that cared for him. Kocaker maintains that under this Court’s case law on proportionality, these circumstances require that this Court determine that the death sentence is disproportionate as this case is not among the least mitigated. Kocaker also asserts that the trial court erred in rejecting the testimony of the defense experts, and in accepting the testimony of State expert Dr. Gamache, who concluded that Kocaker was neither psychotic nor schizophrenic. Moreover, Kocaker argues that this Court can reject the trial court’s conclusions regarding the weight assigned to the mitigation in this case.
Dr. Eisenstein, a mental health expert for the defense, found that both statutory mental health mitigators applied in Kocaker’s case: “[t]he capital felony was committed while [Kocaker] was under the influence of extreme mental or emotional disturbance;” and “[t]he capacity of [Ko-caker] to appreciate the criminality of his ... conduct or to conform his ... conduct to the requirements of law was substantially impaired.” § 921.141(6)(b),(f) Fla. Stat. (2004). In addition, Dr. Eisenstein diagnosed Kocaker with paranoid schizophrenia, dissociative identity disorder, and intermittent explosive disorder. Dr. Carpenter, another defense expert, also diagnosed Kocaker with paranoid schizophrenia. Moreover, Dr. Wood, the defense’s neuroscientist, testified that Kocaker’s brain was abnormally shaped. In contrast, Dr. Gamache, the State’s expert, testified that he did not find “any credible or consistent evidence that [the Defendant] suffers from any type of psychotic disorder, including paranoid schizophrenia or schizoaffective disorder.”
After testimony from these experts at the penalty phase and the Spencer hearing, the trial court rejected both statutory mental health mitigating factors. As to its rejection of the “extreme mental or emotional disturbance” mitigator, the trial court rejected the defense expert’s testimony and determined that any mental disease or defect had developed after Ko-caker committed the murder. In its sentencing order, the trial court found the testimony of Dr. Gamache to be “much more persuasive” than Dr. Eisenstein. Concerning the capacity to appreciate or to conform mitigator, the trial court found that Kocaker knew his conduct was criminal because he attempted to conceal his culpability. Moreover, the trial court noted that the IQ score obtained from testing by Dr. Gamache was more consistent with Kocaker’s DOC records, including his attainment of a GED degree, than the score obtained from testing by Dr. Eisenstein.
The testimonies and diagnoses of Dr. Eisenstein, Dr. Carpenter, and Dr. Wood were rebutted by the testimony of Dr. Gamache. Kocaker emphasizes that Dr. Gamache’s opinion was not supported by competent, substantial evidence in light of the fact that Dr. Gamache failed to review all of Kocaker’s DOC records. However, this partial review does not negate the fact that some of Kocaker’s psychological symptoms were not reported until after the crime. For example, as to Dr. Eisenstein’s dissociative identity diagnosis based on Kocaker’s habit of falsely informing others that he had served in the military, Kocaker has failed to point to evidence in *1230 the record that this habit developed before the crime. Similarly, as to Dr. Eisenstein’s paranoid schizophrenia diagnosis, reports of Kocaker’s auditory hallucinations did not surface until after the crime. The hallucination experienced by Kocaker before the murder during his stay at his sister’s home was classified by Dr. Ga-mache as a visual hallucination which was an uncharacteristic experience for paranoid schizophrenics. Dr. Gamache proposed that this type of hallucination was an effect of Kocaker’s drug abuse. Importantly, Dr. Eisenstein conceded that there was no diagnosis in the record for any type of schizophrenia, borderline personality disorder, dissociative identity disorder, or intermittent explosive disorder, nor an instance where someone had documented delusions or hallucinations.
Dr. Eisenstein also admitted that items in the records he reviewed for the second part of the Spencer hearing could support the State’s position that Kocaker is manipulative and antisocial. In addition, Dr. Jill Poorman stated at Kocaker’s competency hearing that notes from Kocaker’s 2005 and 2007 jail chart indicated that the clinical staff did not feel that Kocaker suffered from schizophrenia, bipolar disorder, or depression. Dr. Poorman also classified Kocaker’s suicide attempt as an “attention-seeking type of event.” This record evidence belies Kocaker’s assertion that “[e]very mental health professional and doctor whose responsibility was to diagnose Mr. Kocaker, including those from DOC, the physicians at Jacksonville hospital, Dr. Carpenter, and Dr. Eisenstein found that Mr. Kocaker suffered from paranoid schizophrenia.” Based on the record, we find that the defense experts’ testimonies could not be reconciled with the other evidence in this case, and competent, substantial evidence supports the trial court’s rejection of the “extreme mental or emotional disturbance” mitigator.
Similarly, there is competent, substantial evidence to support the trial court’s rejection of Dr. Eisenstein’s testimony that Kocaker’s ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Kocaker carefully attempted to cover up his crime by setting the cab on fire, changing his clothes, throwing out his bloody clothing, and calling 911 to report the crime scene as if he simply happened to come upon it. As detailed in part by the trial court in its sentencing order:
The Defendant set the taxicab and the victim afire to conceal the robbery. The Defendant threw his shirt and his gas can into the fire to hide his involvement. The Defendant discarded his shoes. The Defendant put on a new shirt because the shirt he had been wearing became bloody when he tried to conceal the robbery and murder. The Defendant told people that he needed a shower and a change of clothes. The Defendant told people that he was bloody because he had been involved in a bar fight. The Defendant took a shower to wash away the blood. The Defendant obtained a change of clothes from a man named Alvin. The Defendant put his bloody clothes into a bag and discarded them in a trashcan in front of a 7-Eleven store. The Defendant called 911 but indicated that he could not get involved because he might get into trouble. Post-Miranda, the Defendant denied any involvement in the crime and tried to implicate Antoine Powell.
Sentencing Order at 10-11 (footnote omitted). This Court has upheld the trial court’s rejection of this mitigator where “a defendant’s actions during and after the crime has indicated that he was aware of the criminality of his conduct.” Ault, 53 So.3d at 188. Here, Kocaker’s post-mur *1231 der actions demonstrated a consciousness of wrongdoing. Thus, we find that there is competent, substantial evidence which supports the trial court’s rejection of this statutory mental health mitigator.
Finally, Kocaker has failed to explain, other than alleging that Dr. Gamache’s opinion was not supported by competent, substantial evidence, why the weight afforded to the mitigation in this case was not proper. Given the fact that some of Kocaker’s psychological symptoms were not documented until after the murder, as discussed above, it was proper for the trial court to afford Kocaker’s mental health issues some weight as a nonstatutory miti-gator, but still reject the statutory mental health mitigators. Thus, we reject Kocaker’s claim that the mitigators should have been given more weight.
Kocaker focuses his argument on the overarching claim that this case is not the least mitigated of death cases. This Court has upheld a sentence of death in cases which presented aggravation similar to that presented in Kocaker’s case. See England v. State, 940 So.2d 389, 408-09 (Fla.2006) (finding death sentence to be proportionate in the presence of four ag-gravators — including prior violent felony, under felony probation, and HAC — and strong nonstatutory mitigation); Rose v. State, 787 So.2d 786, 804-05 (Fla.2001) (finding death sentence proportionate with four aggravators — including prior violent felony, under felony probation, and HAC— and several nonstatutory mitigators).
Moreover, the case law on which Ko-caker relies to support his argument is distinguishable from this case. For example, the mitigation in this case does not rise to the level of the mitigation found in other cases. See Crook v. State, 908 So.2d 350, 358-59 (Fla.2005) (finding in part that the significant weight given to statutory mental health mitigators was “clearly supported],” substantial mental health mitigation was essentially unrebut-ted, defendant’s personality development was comparable to that of a three or four-year-old, defendant was only twenty years old at the time of the murder, defendant had diminished control over his inhibitions, and defendant had a disadvantaged home life); Hawk v. State, 718 So.2d 159, 163 (Fla.1998) (finding two statutory miti-gators — impaired capacity and age of nineteen — and numerous nonstatutory mitigators) abrogated on other grounds by Connor v. State, 803 So.2d 598 (Fla.2001). Further, the instant case is distinguishable from other cases Kocaker cites because minimal aggravation weighed against substantial mitigation was present in those cases. See Sinclair v. State, 657 So.2d 1138, 1142 (Fla.1995) (finding murder committed in course of robbery ag-gravator was outweighed by defendant’s cooperation with police, defendant’s dull normal intelligence level, and defendant’s lack of a positive male role model); White v. State, 616 So.2d 21, 24-26 (Fla.1993) (finding prior violent felony aggravator was outweighed by defendant’s drug abuse, emotions caused by severed relationship with victim, and impaired capacity and mental or emotional disturbance mitigators); DeAngelo v. State, 616 So.2d 440, 442-44 (Fla.1993) (finding cold, calculated, and premeditated aggravator was outweighed by significant mental mitigation including the defendant’s suffering from bilateral brain damage, hallucinations, delusional paranoid beliefs, and mood disturbance); Nibert v. State, 574 So.2d 1059, 1063 (Fla.1990) (finding HAC aggravator outweighed by unrefuted mitigating evidence that the defendant “was a child-abused, chronic alcoholic who lacked substantial control over his behavior when he drank, and that he had been drinking *1232 heavily on the day of [the victim’s] murder”).[18]
This Court has also found a sentence of death to be proportionate in cases presenting substantial mental health mitigation. See Brant v. State, 21 So.3d 1276, 1283 (Fla.2009) (finding death sentence proportionate with two aggravators — HAC and murder committed during a sexual battery — three statutory mitigators including that the defendant’s “capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired,” and several nonstatutory mental health mitigators including borderline verbal intelligence, family history of mental illness, diminished impulse control and periods of psychosis, and chemical dependence); Rogers v. State, 783 So.2d 980, 987, 1002-03 (Fla.2001) (finding death sentence proportionate with pecuniary gain and HAC aggrava-tors, several nonstatutory mitigators, and impaired ability to appreciate or conform conduct statutory mitigator based on psychosis, brain damage, psychological disease of porphyria, and alcohol abuse).
In this case, the jury recommended death by an 11-1 vote, and the trial court assigned great weight to each of the three aggravators. We find the aggravating circumstances in this case to be significant. Two of the aggravators found — prior violent felony and HAC — are among the weightiest in Florida’s statutory sentencing scheme. Hodges v. State, 55 So.3d 515, 542 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011). All of the nonstatutory mitigation in this case was afforded moderate, some, or very little weight. Moreover, competent, substantial evidence supported the trial court’s rejection of the statutory mitigation. Having carefully reviewed both the facts of this case — including taking into consideration the totality of the circumstances — and death penalty precedent, we conclude that the death sentence in this case is proportionate.
Lethal Injection Protocol
Kocaker claims that Florida’s protocol for execution by lethal injection violates the Eighth Amendment of the United States Constitution because it fails to provide sufficient safeguards to ensure that the execution does not present a substantial or objectively intolerable risk of serious harm to the inmate. We have previously rejected similar lethal injection challenges, and Kocaker has not made any additional allegations that would call into question the State’s current method of execution. See Ventura v. State, 2 So.3d 194, 200 (Fla.2009); see also Pardo v. State, 108 So.3d 558, 563 (Fla.2012), cert. denied, — U.S. -, 133 S.Ct. 815, 184 L.Ed.2d 602 (2012); Valle v. State, 70 So.3d 530, 538 (Fla.), cert. denied, — U.S. -, 132 S.Ct. 1, 180 L.Ed.2d 940 (2011). Accordingly, we deny relief on this claim.
Florida’s Capital Sentencing Process
Kocaker asserts that Florida’s capital sentencing scheme is unconstitutional because the judge, rather than the jury, determines the sentence, and that the jury’s verdict as to the aggravating circumstances need not be unanimous. Kocaker argues that the sentencing scheme fails to satisfy the constitutional requirements articulated in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We deny relief on this claim as this Court has consistently rejected similar challenges *1233 to Florida’s capital sentencing scheme. See, e.g., Rigterink v. State, 66 So.3d 866, 896 (Fla.2011); Frances v. State, 970 So.2d 806, 822 (Fla.2007); Hodges v. State, 885 So.2d 338, 359 nn. 9-10 (Fla.2004). Furthermore, Ring does not apply to cases where the prior violent felony aggravator exists. See Hodges, 55 So.3d at 540.
CONCLUSION
In light of the foregoing, we affirm Ko-caker’s conviction for first-degree murder and his sentence of death.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. Stanton was wearing a shirt when his body was discovered.

. In June of 2004, Kocaker moved in with his sister and her son.

.Such identifications were made by both Ko-caker’s sister and a person who regularly performed yard work on the property.

. The police interviewed Kocaker at the Eck-erd’s on September 1, 2004, as well as on September 3, 2004, after he was arrested for violating his probation.

. The State established that there was a dumpster behind the 7-Eleven. Stephanie testified that Kocaker had thrown something out in the trash can in front of the 7-Eleven, which was corroborated by the store's surveillance video.

. The prosecution had demonstrated that Ko-caker got into Stanton’s cab on August 31, 2004, at 9:32 p.m., and that the cab went “meter off” at 9:57 p.m., and out of service at 10:00 p.m.

. The record reveals, however, that there were no other telephone calls made or received close in time to the 911 call placed by Kocaker at 7:11 a.m. The telephone calls that were closest to the 911 call were as follows: Kocaker called his place of employment at 6:16 a.m., and he called his sister at 7:23 a.m.

.On rebuttal, Detective Klein testified that at no time did Kocaker indicate that Powell knew where he resided.

.According to Kocaker’s sister’s testimony, Kocaker was hit on the head with a brick when he was a child, and he was hit with a large metal door which warranted stitches.

. Kocaker’s sister testified that Kocaker was sexually abused when he was younger.

. Kocaker's sister reported that he was very paranoid.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. See Fla. Stat. § 921.141 (6)(b) (2004) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.”); Fla. Stat. § 921.141 (6)(e) (2004) ("The defendant acted under extreme duress or under the substantial domination of another person.”).

. The trial court specifically found that the mitigating factor that Kocaker was under the influence of crack cocaine at the time of the murder had not been established.

.As noted by the trial judge, on January 2, 1991, Kocaker was sentenced to eighteen years in prison, followed by five years of probation for the commission of eight armed robberies. On June 28, 2004, Kocaker was released from prison and began serving his probationary term. Thus, Kocaker had only served a little more than two months of his five-year probationary term when he murdered Stanton.

. The trial court found Kocaker’s actions surrounding this murder to be "conscienceless or pitiless and unnecessarily torturous” to Stanton.

. On February 24, 1982, Kocaker was convicted of manslaughter. As noted in the sentencing order, Detective Hein testified that Kocaker had told him that he shot and killed that victim in self-defense. On November 15, 1990, Kocaker was convicted of eight robberies with a deadly weapon.

. In still another case cited by Kocaker, the death sentence was vacated because the sentence was improperly based on the trial court’s consideration of a nonstatutory aggravating factor, a scenario that is not present in the instant case. See Miller v. State, 373 So.2d 882, 885 (Fla.1979).